[No. 40643-4-I.    Division One.    June 14, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. FREDERICK N. PARRA, *Defendant*, RICHARD R. KENT, *Appellant*.

*Nielsen, Broman & Associates, P.L.L.C.*, by *Eric Broman* and *Kitteridge Oldham*, for appellant.

*David S. McEachran, Prosecuting Attorney*, and *Laura D. Hayes, Deputy*, for respondent.

GROSSE, J. — Richard Kent appeals his conviction for second degree robbery of a credit union, arguing that his custodial confession should be suppressed because he refused to sign a waiver of counsel form. But his refusal to sign the form is merely one factor in determining whether he effectively asserted a *Miranda*[1] right. Looking to the totality of the facts and circumstances surrounding his refusal, we conclude that he waived his rights, and that his waiver was knowing, voluntary, and intelligent.

Kent also contends that the court's failure to give a unanimity instruction was reversible error because there was no corroborative evidence supporting one of two teller's testimony that she gave Kent money out of fear of injury,

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

rather than in compliance with bank policy. But no rational juror could have had a reasonable doubt that Kent obtained the money from both tellers by implicitly threatening the immediate use of force, which is sufficient proof of robbery. Accordingly, the error was harmless.

## FACTS

Richard Kent, a suspect in the robbery of the Whatcom Educational Credit Union, was at a Department of Corrections' office when two detectives arrived and directed him to follow them to an empty office. The detectives informed Kent of his *Miranda* rights, and Kent signed a form indicating that he understood his rights. But Kent refused to sign the line on the form indicating that he was willing to waive his rights and speak to the detectives without his lawyer.

Specifically, Kent stated, "I refuse to sign that but I'm willing to talk to you." Kent then explained that several years ago, while being interviewed, he had asked for an attorney but the police refused to get him one. The detective told Kent that "if he at any time wanted to talk to an attorney all he had to do was ask." Kent never asked to speak to an attorney. The detectives then began questioning Kent about the robbery. Kent answered most of the questions but he invoked his right to remain silent when asked whether he had recently used heroin.

The detectives arrested Kent during the interview. Upon arrest, Kent confessed to using drugs and confessed to the robbery. He also stated that he made a mistake by coming to the Department of Corrections' office and that he had been known to carry a gun and should have gone out in a blaze of glory. In a search of Kent's residence, the police recovered a black hood, a surveillance videotape of the incident, and still photos taken from the tape.

The trial court ruled that Kent's custodial statements were admissible. Kent stipulated that he was the person wearing the hood covering his head at the credit union during the time frame in question.

At trial, the State presented evidence that the tellers began setting off silent alarms when Kent, with his right hand tucked in the front of his pants, quickly entered the credit union. Kent approached one teller and demanded money. That teller, Steve Johnson, testified that he never saw a gun and Kent never verbally threatened him. But he stated that he feared that if he did not comply with Kent's demands, Kent might shoot him. The State presented evidence that Johnson, who by lifting a bar with his foot was able to activate the silent alarm, pulled on the bar so hard that he was able to lift the bar from the cement to which it had been fastened.

Kent then approached a second teller, Kimberly Wilson. Wilson testified that she had overheard Kent talking to Johnson. She also did not see a gun, but she thought that he had a gun by the way he was holding himself. When asked why she gave him the money she stated, "Because he had something covering his face and he was demanding money from me and I take it, you know, as kind of a threat so I did what I was told. I didn't want to complicate anything. I didn't want to, you know, I just didn't want to do anything that would set him off, you know." She testified that she tried not to look at him because she was afraid of what he might do if she saw too much.

Wilson also stated that Kent spoke in a calm voice and did not make threats towards her. She testified that Kent used both hands to take the money. She further testified that if someone came up to the window and demanded money, it was bank policy to give the person the money demanded, regardless of whether they appeared to have a weapon.

Kent was convicted as charged with one count of second degree robbery. During the sentencing hearing, the State presented evidence that Kent had been convicted of two prior "most serious offenses." The evidence consisted of a certified judgment and sentence from Whatcom County showing a conviction for first degree robbery and a compilation of documents from the California Department of

Justice. The California documents included, among other items, fingerprints and a photograph relating to the booking of Kent for first degree robbery, a criminal complaint, a guilty plea statement, and a document indicating an eight-year sentence. All of the documents contained the same name and cause number.

The court, persuaded by the evidence, sentenced Kent to life in prison without the possibility of parole in accordance with the Persistent Offender Accountability Act (POAA).

## DISCUSSION

### 1. Kent's custodial statements were admissible.

■ Kent argues that he asserted his right to counsel when he refused to sign a waiver form, and, as a result, the court should have suppressed his custodial statements. But our inquiry begins only with his refusal to sign the form. And having reviewed the record, we agree with the trial court's conclusion that Kent's waiver was knowing, intelligent, and voluntary.

■ ■ The State must prove the waiver of a *Miranda* right by a preponderance of the evidence.[2] Unlike the facts in *State v. Grieb*,[3] wherein the police continued questioning a defendant after he unequivocally stated, "I don't wanna waive my rights,"[4] Kent simply stated, "I refuse to sign that but I'm willing to talk to you." While his refusal to sign the form may cast doubts on the State's waiver claim,[5] his refusal, standing alone, is not dispositive.[6] The question of waiver "must be determined on 'the particular facts and

---

[2]*State v. Wheeler,* 108 Wn.2d 230, 237-38, 737 P.2d 1005 (1987).

[3]*State v. Grieb,* 52 Wn. App. 573, 761 P.2d 970 (1988).

[4]*Id.* at 574.

[5]*United States v. Heldt,* 745 F.2d 1275, 1277 (9th Cir. 1984).

[6]*See United States v. Andaverde,* 64 F.3d 1305, 1314 (9th Cir. 1995). *See also United States v. Vaughn,* 496 F.2d 622, 622 (6th Cir. 1974).

circumstances surrounding that case, including the background, experience, and conduct of the accused.' "[7]

Although Kent refused to sign the waiver form, he clearly indicated through his statement and actions that his willingness to speak without counsel was knowing, intelligent, and voluntary. Kent stated, without interruption and without any sign of coercion, that he was unwilling to sign the form but was willing to talk to the detectives. He explained that he was refusing to sign the form because he was denied the right to see his attorney in a previous experience with police interrogation. When told that he could request an attorney at any time, Kent did not invoke his right to have one present during questioning. He answered the detectives' questions freely, until asked a question about drug use, at which time he asserted his right to remain silent.

Kent's explanation indicated that he knew what he was doing and that he did not need the advice of counsel. He was not handcuffed, did not request to leave the room, and sufficiently understood his rights to the extent of declining to answer a question with which he felt uncomfortable, indicative of a previous waiver of that right. The detectives made no threats or promises, nor in any manner attempted to overcome Kent's will. We are convinced from the totality of the circumstances that the court's finding that Kent waived his right to counsel was plausible, and accordingly was not clearly erroneous.

2. The evidence was sufficient to support Kent's conviction beyond a reasonable doubt.

■ Kent argues that evidence presented by the State demonstrating force or fear was insufficient to support his conviction for second degree robbery. We disagree. A reasonable juror could have found the essential elements of the crime beyond a reasonable doubt.

---

[7]*North Carolina v. Butler,* 441 U.S. 369, 374-75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) (citation omitted). The court's finding that Kent's waiver was knowing and intelligent, and the factual findings supporting the legal conclusion of voluntariness, are reviewed for clear error. *United States v. Doe,* 155 F.3d 1070, 1074 (9th Cir. 1998).

█ A person commits robbery in the second degree by taking personal property from another, against their will, by the threatened use of immediate force, violence, or fear of injury.[8] In reviewing a sufficiency of the evidence claim, we ask whether any rational juror could find the essential elements of the crime beyond a reasonable doubt.[9] We view the evidence, and all reasonable inferences therefrom, in a light most favorable to the State.[10]

In *State v. Collinsworth*,[11] we were asked to determine the evidence required to establish robbery of a bank when the defendant does not utilize overt physical or verbal threats or display a weapon. In one of several instances of robbery, Collinsworth approached a teller at a bank branch and demanded money without presenting a weapon or making verbal threats. The bank, like the credit union here, had a policy requiring tellers to comply with any demand for money. We stated: "No matter how calmly expressed, an unequivocal demand for the immediate surrender of the bank's money, unsupported by even the pretext of any lawful entitlement to the funds, is fraught with the implicit threat to use force."[12]

In reaching this conclusion, we cited the long-standing rule that " 'if the taking of the property be attended with such circumstances of terror, or such threatening by menace, word, or gesture as in common experience is likely to create an apprehension of danger and induce a man to part with property for the safety of his person, it is robbery.' "[13] Any force or threat, regardless of how slight, which induces

---

[8]RCW 9A.56.190 and .210.

[9]*State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[10]*Id.* at 201.

[11]*State v. Collinsworth*, 90 Wn. App. 546, 966 P.2d 905 (1997), *review denied*, 135 Wn.2d 1002 (1998).

[12]*Id.* at 553 (footnote omitted).

[13]*Id.* at 551 (quoting *State v. Redmond*, 122 Wash. 392, 393, 210 P. 772 (1922)).

an owner to part with property is sufficient to sustain a robbery conviction.[14]

Here, in addition to Johnson's testimony, the evidence related to his attempt to activate the bank's alarm is compelling. Wilson testified that she complied with Kent's repeated demands for money because she was afraid and "didn't want to do anything that would set him off . . . ." Although she never saw a firearm, she stated that it seemed implied from the way he was holding himself when he came to her window.

In addition to the fact that Kent's demand for money from the tellers carried with it the implicit threat of force, the evidence clearly supports a conclusion that both Johnson and Wilson were fearful of injury, and would have handed over the money even in absence of the bank's policy directing tellers to comply with a robber's request. As a result, the evidence was sufficient to support Kent's conviction for second degree robbery.

3. The court's failure to provide a unanimity instruction was harmless beyond a reasonable doubt.

In cases involving multiple acts, the jury must be unanimous as to which act forms the basis for the conviction.[15] Here, we must presume that the State's inexplicable failure to request a unanimity instruction was reversible error unless no rational juror could have had a reasonable doubt as to either act establishing the crime.[16] Kent's constitutional claim centers on whether the robbery of Wilson took place by the use or threatened use of immediate force, violence, or fear of injury. Given our holding in *Collinsworth*, we find the evidence overwhelming as to the robbery of both tellers and the failure to instruct harmless.

Both tellers were approached by the same man. The man wore a hood over his head that covered his face, and he

---

[14]*State v. Handburgh*, 119 Wn.2d 284, 293, 830 P.2d 641 (1992).

[15]*State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984). *See also State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

[16]*Kitchen*, 110 Wn.2d at 411.

walked with his hand in his pants as if he were carrying a weapon. The police found the hood described by the tellers in Kent's apartment, and Kent stipulated to the fact that he wore the hood outside the credit union on the day in question. This evidence was sufficient to establish Kent's identity beyond a reasonable doubt.

Kent unlawfully demanded money from both tellers. Case law is clear that a demand upon a bank teller to surrender the bank's funds carries with it an implicit threat of force.[17] Unlawfully taking property of another by the threatened use of force constitutes second degree robbery.[18] After considering the totality of the evidence, and in light of the standard expressed in *Collinsworth*, we are convinced that no rational juror could have entertained a reasonable doubt as to whether Kent's demand for money from either teller established the crime.[19]

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

AGID, A.C.J., and COX, J., concur.

Review denied at 139 Wn.2d 1010 (1999).

---

[17]*See Collinsworth*, 90 Wn. App. at 553-54.

[18]*See* RCW 9A.56.190 and .210.

[19]*See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).